627 P.2d 1244

**Margaret C. EIS, Plaintiff-Appellant,**

v.

**William CHESNUT, M. D.,
Defendant-Appellee.**

No. 4840.

Court of Appeals of New Mexico.

March 19, 1981.
Certiorari Denied May 6, 1981.

Gallagher, Casados & Martin, J. E. Casados and Robert A. Martin, Albuquerque, for plaintiff-appellant.

Rodey, Dickason, Sloan, Akin & Robb, P. A., W. Robert Lasater, Jr., Albuquerque, for defendant-appellee.

## OPINION

LOPEZ, Judge.

Plaintiff, Mrs. Eis, appeals the summary judgment granted to the defendant, Dr. Chesnut, in this personal injury suit. Plaintiff's theories of recovery were medical malpractice and battery. At oral argument, plaintiff's counsel narrowed the malpractice claim to negligence in failing to diagnose the cause of Mrs. Eis's knee pain following the second operation the doctor performed on her leg. Her claim of battery rests on the failure of Dr. Chesnut to obtain her consent before performing the second operation, although her daughter consented to it.

The issue is the propriety of the summary judgment. We reverse on both counts.

Dr. Chesnut operated twice on Mrs. Eis's hip and leg. During the first operation, on June 27, 1976, he fractured her femur when trying to insert a pin into it. A longer pin was needed, but none was available. The longer pin was inserted July 2, 1976, at a second operation. An x-ray taken that day showed that the new pin protruded from the lower end of the femur, and a radiology report one week later indicated that the pin protruded into the soft tissues adjacent to the supracondylar area. Mrs. Eis complained of intense knee pain in her visits to Dr. Chesnut during the five months after her second operation and before she left Albuquerque for Florida. He responded with medications for her pain. In Florida, in January of 1977, she saw Dr. Jahn, who took x-rays and discovered that the prosthesis inserted by Dr. Chesnut was protruding out from the femur and impaling the patella or kneecap. He corrected this condition by surgery on February 17, 1977, in which he sawed off the protruding portion of the prosthesis. This surgery effectively relieved Mrs. Eis's complaints.

Mrs. Eis herself never signed a written consent to the second operation performed by Dr. Chesnut. Her daughter signed the form the day before the surgery, because, as the form states, Mrs. Eis was confused at that time.

*Malpractice.* It is Mrs. Eis's position that Dr. Chesnut should have diagnosed the cause of her knee pain. This claim is buttressed by the reports of the hospital radiologist indicating that x-rays taken after surgery showed the pin already protruding from the femur. There is some evidence that a migration downward of the pin would not be unusual in the circumstances surrounding Mrs. Eis's surgery. Mrs. Eis's claim is also supported by part of Dr. Jahn's deposition which states that the inflammation of her knee was caused by the protruding pin.

█ Summary judgment is proper if there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. N.M.R.Civ.P. 56(c), N.M.S.A.1978. The burden is on the moving party to show the absence of a genuine issue of fact. *Goodman v. Brock*, 83 N.M. 789, 498 P.2d 676 (1972), and the party opposing the motion is to be given the benefit of all reasonable doubts in determining whether a genuine issue exists. *Pharmaseal Laboratories, Inc. v. Goffe*, 90 N.M. 753, 568 P.2d 589 (1977).

█ Dr. Chesnut failed to meet his burden of showing the absence of a genuine issue of disputed fact. The affidavit of the orthopedic surgeon relied on by defendant, and the deposition of Dr. Jahn, are insufficient to meet the prima facie case of negligence presented by the undisputed facts. It is not enough for medical experts to offer an opinion that the treating physician was not negligent in his treatment; the evidence of the experts must overcome the reasonable inferences of negligence raised by the facts of no pain before or after the first operation; projection of the longer pin beyond the femur seen by x-ray on the day of the second surgery and eight days later; continuing complaints of knee pain for five months after the surgery and during treatment by the defendant; diagnosis through x-ray, by the second surgeon and immediate

relief of the pain when the extended portion of the pin was sawed off.

Mrs. Eis's painful knee condition immediately following the second knee operation and its continued painfulness for five months thereafter until the impalement was corrected, raises the inference that impalement existed from the time of the second surgery. Indeed, portions of Dr. Jahn's deposition may be read to so state. The refusal of both medical experts, however, who did not see Mrs. Eis during her treatment by defendant, to give an opinion when the impalement occurred does nothing to destroy the logical inferences prevailing in plaintiff's favor. Whether Dr. Chesnut should have correctly diagnosed her condition earlier is a factual issue that could not be resolved at a summary judgment hearing.

■ Dr. Chesnut, citing *Cervantes v. Forbis*, 73 N.M. 445, 389 P.2d 210 (1964), asserts that Mrs. Eis needed to present expert testimony to defeat his motion for summary judgment. While *Cervantes* was also a malpractice case involving orthopedic surgery on the femur, the doctor was charged with negligence in performing the surgery, which is not true in the case before us. We do not dispute that, absent some glaring error such as inadvertently leaving a surgical instrument inside a patient, a plaintiff must offer expert testimony to defeat a defendant's motion for summary judgment when the defendant has presented expert testimony that he was not negligent and the issue is the propriety of a certain surgical procedure. Mrs. Eis's claim is not, however, negligent performance of surgery, but negligence in failure to diagnose. In *Pharmaseal* the Supreme Court recognized an exception to the requirement that the plaintiff must present expert testimony to avoid summary judgment against him. When the alleged negligence is of the kind which could be determined by the common knowledge of the average person, expert testimony is not needed to raise a genuine factual issue as to whether the act was negligent.

From the x-rays taken in July after the second operation, and from the evidence that Mrs. Eis's intense knee pain developed subsequent to that operation and continued until the end of the pin was removed by Dr. Jahn, we believe that an average person could reasonably infer from common knowledge that Dr. Chesnut should have known that the protruding pin was the cause of Mrs. Eis's pain. *Cf. Mascarenas v. Gonzales*, 83 N.M. 749, 497 P.2d 751 (Ct.App. 1972) (from the evidence that the patient's ribs were intact prior to treatment by a chiropractor, that the treatment consisted of pressure which resulted in a crack followed by immediate pain, and that after the treatment, the patient had fractured ribs, the jury could properly infer that the chiropractor caused the fracture). We do not hold that this evidence is conclusive or sufficient to prove Dr. Chesnut's negligence, but only that it is sufficient to raise a genuine factual issue concerning negligence. As we have already said, Dr. Chesnut's evidence in support of his motion for summary judgment did not dispose of this issue. The summary judgment against plaintiff on her malpractice claim was improper.

■ *Battery.* A physician who operates without the patient's consent commits a battery. *See,* Prosser, Law of Torts § 18 (4th ed. 1971). As Justice Cordozo said:

Every human being of adult years and sound mind had a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits [a tort], for which he is liable in damages.

*Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 129–30, 105 N.E. 92, 93 (1914). In a suit against a surgeon for battery, there is no need that the patient be physically damaged by the surgery. Consequently, there is no need for expert medical testimony to show either causation or standard of care. The only question to be determined is whether the patient consented to the specific operation performed. *Gerety v. Demers*, 92 N.M. 396, 589 P.2d 180 (1978). Two exceptions to the consent requirement

are given in *Canterbury v. Spence*, 464 F.2d 772 (D.C. Cir. 1972), a case quoted with approval in *Gerety*. The court in *Canterbury* found that the patient's consent need not be obtained in an emergency, or when the disclosure of the risk will be harmful to the patient. As the court wrote:

Two exceptions to the general rule of disclosure have been noted * * * * The first comes into play when the patient is unconscious or otherwise incapable of consenting, and harm from a failure to treat is imminent and outweighs any harm threatened by the proposed treatment. When a genuine emergency of that sort arises, it is settled that the impracticality of conferring with the patient dispenses with the need for it * *

The second exception obtains when risk-disclosure poses such a threat of detriment to the patient as to become unfeasible or contraindicated from a medical point of view. It is recognized that patients occasionally become so ill or so emotionally distraught on disclosure as to foreclose a rational decision, or complicate or hinder the treatment, or perhaps even pose psychological damage to the patient * * * * The critical inquiry is whether the physician responded to a sound medical judgment that communication of the risk information would present a threat to the patient's well-being.

*Id.* at 788–89. In such situations, a relative's consent should be obtained, if possible. *Canterbury*.

█ Dr. Chesnut submitted evidence that Mrs. Eis's daughter signed the consent form for the second operation. This evidence is not controverted. The consent form, signed at 4:30 p. m., carries a notation that the patient could not request or authorize treatment because she was confused, thus explaining the daughter's signature. There is no evidence, however, that the operation was performed in an emergency, or that Mrs. Eis was confused for such a long period of time as to preclude obtaining her consent to the operation. The hospital notes of that day indicate that, on the contrary, Mrs. Eis was disoriented only temporarily on the day before surgery when the daughter's consent was obtained. A genuine issue of fact exists as to whether Mrs. Eis's consent could have been obtained, making summary judgment improper. A fact finder must determine whether the situation falls within either of the two exceptions explained in *Canterbury* under which the patient himself need not consent to the surgery performed.

The judgment of the trial court is reversed and the case is remanded to the district court for proceedings consistent with this opinion.

IT IS SO ORDERED.

WOOD and WALTERS, JJ., concur.