FILED
United States Court of Appeals
Tenth Circuit

October 23, 2014

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

ANDREA HOLLEY, personal
representative of the Estate of Dustin Van
Jelgerhuis, deceased; JANICE FAY
MILCHERT,

       Plaintiffs - Appellants,

v.

EVANGELICAL LUTHERAN GOOD
SAMARITAN SOCIETY, a North
Dakota non-profit corporation, d/b/a
Grants Good Samaritan Center,

       Defendant - Appellee.

No. 13-2041
(D.C. No. 1:12-CV-00320-KBM-LFG)
(D. N.M.)

ORDER AND JUDGMENT*

Before **KELLY**, **EBEL** and **PHILLIPS**, Circuit Judges.

In this medical malpractice action, Plaintiffs appeal summary judgment for

Defendant Evangelical Lutheran Good Samaritan Society ("Good Samaritan") on

Plaintiffs' claim that Good Samaritan's negligence caused the death of Justin Van

_____

*This order and judgment is not binding precedent, except under the doctrines of law of
the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive
value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Jelgerhuis. Having jurisdiction under 28 U.S.C. §§ 636(c)(3) and 1291, we AFFIRM because Plaintiffs failed to establish a triable question as to whether Good Samaritan's alleged negligence was the proximate cause of Van Jelgerhuis's death.

## I. BACKGROUND

Good Samaritan operates a long-term care facility in Grants, New Mexico. Van Jelgerhuis, at age seventeen, was admitted to that facility in April 1990, after suffering severe head and neck injuries in a hang-gliding accident. As a result of those injuries, Van Jelgerhuis became a quadriplegic, unable to move voluntarily except to blink or smile. His body, however, was subject to involuntary movements caused by, for example, coughing, seizures, or muscle spasms.

Van Jelgerhuis's condition required that, when he was in bed, his headboard be raised at a forty-five-degree angle and that he be placed on either his back or his right side. From April 1990 through July 2002, Good Samaritan used bed rails to keep Van Jelgerhuis from falling out of bed. After July 2002, however, Good Samaritan became a "restraint-free" facility and stopped using the bed rails. Instead, Good Samaritan placed Van Jelgerhuis in an adjustable bed, lowered to the floor, with mats on either side to protect him if he were to roll or fall off of the bed due to his body's involuntary movements. Van Jelgerhuis rolled out of bed on six occasions from 2003 through 2007. He had no further falls for the next four and one-half years, from 2007 until October 9, 2011. On that night of October 9, nurses checked Van Jelgerhuis at 11:30 p.m.; he was fine. But at 11:45 p.m., a nurse found Van Jelgerhuis face down on one of the mats next

2

to his bed.  He had died, apparently from positional asphyxiation.

Plaintiffs—Van Jelgerhuis's sister, Andrea Holley, as the personal representative of his estate, and Van Jelgerhuis's mother, Janice Milchert[1]—sued Good Samaritan, alleging that its negligence caused Van Jelgerhuis's death.[2]  The parties consented to having a magistrate judge decide their case, see 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 73, and the magistrate judge granted Good Samaritan summary judgment.  Plaintiffs appeal that decision.

## II. STANDARD OF REVIEW

New Mexico law governs the substantive legal issues presented in this diversity action, including the burdens of proof.  See Prager v. Campbell Cnty. Mem'l Hosp., 731 F.3d 1046, 1060 (10th Cir. 2013).  But federal law governs the standard for granting summary judgment.  See id.  The district court "shall grant summary judgment if the movant [Good Samaritan] shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  We review de novo the magistrate judge's decision to grant Good Shepherd summary judgment, considering the evidence in the light most favorable to Plaintiffs, as the non-

_____

[1] At times, Plaintiffs' pleadings refer to Plaintiff Milchert as Melchert.

[2] Holley asserted a wrongful death claim, see N.M. Stat. §§ 41-2-1, 41-2-3, while Milchert alleged a cause of action for loss of consortium.  Because Plaintiffs premised both claims on Good Samaritan's negligence, the parties and the district court have treated these claims as one for summary judgment purposes.  See Turpie v. Sw. Cardiology Assocs., P.A., 955 P.2d 716, 717-18 (N.M. Ct. App. 1998) (holding loss of consortium claim cannot survive after jury determined defendant's negligence was not the proximate cause of the plaintiff's injured spouse's damages).  We do so as well.

moving parties.  See Christoffersen v. United Parcel Servs., Inc., 747 F.3d 1223, 1227 (10th Cir. 2014).

## III. DISCUSSION

To recover for negligence in a medical malpractice case governed by New Mexico law, Plaintiffs had to establish that: (1) Good Samaritan owed Van Jelgerhuis a duty recognized by law; (2) Good Samaritan breached that duty; and (3) the breach proximately caused Van Jelgerhuis's death.[3]  See Alberts v. Schultz, 975 P.2d 1279, 1284 (N.M. 1999); Baer v. Regents of Univ. of Calif., 884 P.2d 841, 844 (N.M. Ct. App. 1994).

As to the first element, the magistrate judge adopted the opinion of Plaintiffs' nursing expert, Virginia Verity, R.N., that Good Samaritan owed Van Jelgerhuis "a duty to respond to [his] multiple falls from his bed by analyzing and determining the cause of those falls, and based upon that analysis, to put appropriate measures into place to ensure [his] safety."  (Aplt. App. at 305 (quoting Aplt. App. at 125).)  As to the second element, we will assume, without deciding, that Good Samaritan breached its duty and, thus, was negligent.  See Alberts, 975 P.2d at 1284 ("A healthcare provider who breaches [its] duty of skill and care is negligent.").

---

[3] No one disputes that this case involves medical or professional malpractice which, as distinguished from an ordinary negligence case, is one that "involves the use of specialized knowledge or skill to make a judgment call as to the appropriate thing to do or not do," Richter v. Presbyterian Healthcare Servs., 326 P.3d 50, 56 (N.M. Ct. App.), cert. denied, 326 P.3d 1111 (N.M. 2014).

4

We focus our analysis, then, on the third element and consider whether Good Samaritan's breach of the duty it owed Van Jelgerhuis proximately caused his death. Proximate cause is cause

> which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred. It need not be the only cause, nor the last nor nearest cause. It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury.

Id. at 1286 (quoting NMRA Civ. UJI 13-305 (1998)). To survive summary judgment on this third element, Plaintiffs had to present sufficient evidence from which a jury could find, by a preponderance of the evidence, that Good Samaritan's breach proximately caused Van Jelgerhuis's death. See id.; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Plaintiffs failed to present such evidence.

New Mexico requires a plaintiff to use expert testimony "in most medical malpractice suits" to prove all three negligence elements: "to establish a standard of care, to assess the [healthcare provider's] performance in light of the standard, and to prove causation."[4] Gerety v. Demers, 589 P.2d 180, 191 (N.M. 1978); see Gonzales v. Carlos Cadena, D.P.M., P.C., No. 30,015, 2010 WL 3997235, at *1 (N.M. Ct. App. Feb. 19, 2010) (unreported) ("Generally, an expert is required [in a medical malpractice case] to establish both a deviation from the standard of care and causation."); see also Alberts,

---

[4] This expert testimony must be stated "to a reasonable degree of medical probability." See Alberts, 975 P.2d at 1286. Like the preponderance-of-the-evidence standard, the "'reasonable degree of medical probability' standard[] connote[s] proof that . . . is more probable than not." Id. at 1287 (addressing expert testimony as to causation).

5

975 P.2d at 1284; Buchanan v. Downing, 394 P.2d 269, 272 (N.M. 1964). This rule requiring expert testimony stems from the fact that medical malpractice actions often involve "technical and specialized subject matter," Lopez v. Sw. Cmty. Health Servs., 833 P.2d 1183, 1188 (N.M. Ct. App. 1992), that is not within the "common knowledge ordinarily possessed by an average person," Gerety, 589 P.2d at 195. But New Mexico recognizes an exception to the requirement of expert testimony if the subject matter of a medical malpractice action does fall with an average layperson's "common knowledge." Id.; see also Pharmaseal Labs., Inc. v. Goffe, 568 P.2d 589, 594 (N.M. 1977).

In this case, the district court determined that Plaintiffs needed expert testimony to establish both Good Samaritan's breach and that its breach caused Van Jelgerhuis's death. Plaintiffs do not dispute that they needed expert testimony as to Good Samaritan's breach, and they presented their expert Verity's deposition testimony on that issue. But Plaintiffs did not present any expert testimony that Good Samaritan's breach caused Van Jelgerhuis's death. Verity did not offer an opinion on causation, and Plaintiffs did not seek to have Verity testify as an expert on causation. Further, Plaintiffs (and Verity) acknowledged that Verity is not qualified to offer an opinion on causation. But when Good Samaritan pointed out, in its summary judgment motion, that Plaintiffs had no expert evidence that Good Samaritan's negligence caused Van Jelgerhuis's death, Plaintiffs submitted a supplemental affidavit from Verity stating, among other things, that there were four available fall prevention measures—side bed rails, a bigger bed, an alarm, and body bolsters—"which could reasonably have been expected either to stabilize the

6

decedent in his bed, thereby preventing falls, or alternatively to warn staff in the event of a fall while the decedent was not under direct observation by staff." (Aplt. App. at 157 ¶ 8.) The district court struck that portion of Verity's supplemental affidavit, however, because she was not qualified to testify as to causation and, in any event, Verity's affidavit contradicted her earlier deposition testimony "that she could not say that any specific intervention would have prevented Mr. Van Jelgerhuis'[s] fall or asphyxiation."[5] (Id. at 245-46.) On appeal, Plaintiffs do not challenge the district court's decision to strike that portion of Verity's affidavit. Plaintiffs thus failed to submit any expert testimony that Good Samaritan's breach caused Van Jelgerhuis's death.

Plaintiffs contend they do not need expert testimony on causation because the "[d]etermination of [causation] does not entail any special medical or technical expertise, and a lay jury w[ould] be fully capable of making an informed determination of this issue." (Id. at 132.) We cannot agree.

Plaintiffs recognize that they needed expert testimony to establish that Good Samaritan breached the duty it owed Van Jelgerhuis because the determination of the best available methods to reduce a particular patient's risk of falling involves the exercise of medical judgment. Cf. Treaster v. HealthSouth Corp., 442 F. Supp. 2d 1171, 1181 (D. Kan. 2006) (applying Kansas law and noting that "'the majority of jurisdictions

---

[5] Verity further testified at her deposition that none of these fall prevention measures available to Good Samaritan would have eliminated all falls, nor would they have eliminated the possibility of a patient asphyxiating after falling.

7

considering the question of whether restraining a patient is, in fact, a technical medical decision have concluded that it is a complex determination, and therefore expert testimony is required to educate the jury as to the appropriate standard of care'") (quoting Banfi v. Am. Hosp. for Rehab., 529 S.E.2d 600, 606-07 (W. Va. 2000)).  Plaintiffs' nursing expert, Verity, specifically testified in her deposition that Good Samaritan had several different fall prevention measures available to it, including placing Van Jelgerhuis in a larger bed, using "trunk wedges" or "bolsters" to stabilize his body, connecting an alarm to him that would go off if he moved to any significant degree, and reinstituting the use of side bed rails.  But, according to Verity, the determination of what fall prevention measures are appropriate for a given patient turns on a "complex" professional assessment of available fall prevention measures and the circumstances and condition of that particular patient.  Verity indicated that this determination is complex because, while the various fall prevention measures are intended to ensure a patient's safety from falling, each fall prevention measure itself poses other risks to the patient, including risks of entrapment, asphyxiation, or strangulation.

Plaintiffs, then, do not dispute that jurors would require expert testimony on the standard of care at issue here and its breach, because those issues involve a complex professional assessment.  It follows that jurors would also require expert testimony to show that the experienced harm was caused by Good Samaritan's breach of the standard of care.  Like the issue of breach, in this case causation turns on Good Samaritan's exercise of its medical judgment and thus is not within the "common knowledge

8

ordinarily possessed by an average person," Pharmaseal Labs., 568 P.2d at 594. See

Gonzales, 2010 WL 3997235, at *2 (holding that expert testimony was necessary to

establish the standard of care, breach, and proximate causation in medical malpractice

case because "the average jury would know little to nothing about any risks inherent in

performing an ingrown toe nail extraction on someone with diabetes or the standard of

care for a podiatrist performing such an extraction").[6] The magistrate judge, therefore,

did not err in granting Good Samaritan summary judgment because Plaintiffs failed to

offer expert testimony that it was more likely than not that Good Samaritan's alleged

---

[6] This case is distinguishable from medical malpractice cases in which New Mexico courts have determined that expert testimony was unnecessary because the subject matter was within an average layperson's common knowledge. See Toppino v. Herhahn, 673 P.2d 1297, 1300-01 (N.M. 1983) (holding expert testimony unnecessary to establish that doctor negligently performed five breast reconstruction surgeries because "it is within the realm of the common knowledge of the average person that a breast implant should balance its healthy counterpart in size and location"); Helfferich v. Corr. Med. Servs., Corizon, No. 32,749, 2013 WL 7752644, at *1-*2 (N.M. Ct. App. Dec. 9, 2013) (unreported) (holding expert testimony unnecessary to establish that failure to treat cavities for over one year breached the standard of dental care and was the proximate cause of pain plaintiff suffered while awaiting treatment); Eis v. Chesnut, 627 P.2d 1244, 1245-46 (N.M. Ct. App. 1981) (holding expert evidence unnecessary to prove surgeon negligently failed to diagnose source of patient's knee pain, where two x-rays taken within one week after knee surgery showed pin inserted during surgery was protruding from femur into soft tissue, because "average person could reasonably infer from common knowledge that Dr. Chesnut should have known that the protruding pin was the cause of Mrs. Eis's pain"); Mascarenas v. Gonzales, 497 P.2d 751, 753-54 (N.M. Ct. App. 1972) (holding expert testimony unnecessary to prove chiropractor negligently broke four of patient's ribs during an adjustment, because "[a] manipulation of the spine which results in four fractured ribs is not a condition peculiarly within the knowledge of medical men").

negligence was the proximate cause of Van Jelgerhuis's death.[7]

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's decision to enter

summary judgment for Good Samaritan.

ENTERED FOR THE COURT


David M. Ebel
Circuit Judge

---

[7] Plaintiffs asserted, for the first time on appeal, that they do not need expert testimony to prove causation because they can establish causation, instead, by invoking the doctrine of res ipsa loquitor. Ordinarily, however, parties cannot rely on a new theory asserted for the first time on appeal. See Schwartz v. Booker, 702 F.3d 573, 585 (10th Cir. 2012). And Plaintiffs ultimately disavowed this theory in their reply brief. In any event, such a theory is unavailing in this case.